UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRINA ASIEDU,

Plaintiff,

– against –

BROADREACH MEDICAL
RESOURCES *and* J.N. SAVASTA CORP.,

Defendants.

**OPINION & ORDER**

19 Civ. 1825 (ER)

Ramos, D.J.:

Trina Asiedu, proceeding *pro se*, brings this action against her former employer, Broadreach Medical Resources ("Broadreach"), and J.N. Savasta Corp. ("JNS" and together with Broadreach, "Defendants"), alleging discrimination and retaliation on the basis of race and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1981, and the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.* ("NYSHRL"). Before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking dismissal of the Complaint in its entirety. Doc. 34. For the reasons set forth below, Defendants' motion is GRANTED.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  Factual Background

#### i.   The Parties

Asiedu is a Black woman. Doc. 37 ¶ 2. She began employment at Broadreach in 2005 as a temporary employee in member services and became a full-time employee on September 24, 2007 as a customer services representative. Doc. 49 ¶ 15. During her

---

[1] These facts are undisputed unless otherwise noted.

employment with Broadreach, she was promoted several times, as further discussed below.

Broadreach is in the business of pharmacy benefits administration with approximately 20 to 25 employees.  Doc. 37 ¶ 3.  Joseph Savasta is the Chief Executive Officer and owns 75% of Broadreach.  *Id.* ¶¶ 4, 6.  Timothy Teen became the President on September 27, 2015 and owns 25% of Broadreach.  *Id.* ¶¶ 5, 6.

JNS[2] develops employee benefit programs for its clients.  *Id.* ¶ 7.  Savasta is the founder, President, and owner of JNS.  *Id.* ¶ 8.  The parties dispute whether Teen has ever been employed by JNS.  Doc. 49 ¶ 9.[3]  Asiedu has never been employed by JNS.  Doc. 37 ¶ 10.[4]  Nor has she ever reported to, received assignments from, or had her compensation determined by anyone employed by JNS.  *Id.* ¶¶ 11–13.

Broadreach and JNS are both owned by Savasta.  *Id.* ¶ 14.  The companies have separate lease and sublease agreements for office space, bank accounts, credit cards, accounting and bookkeeping, invoices, tax returns, and management.  *Id.*  The parties dispute whether the companies have separate clients,[5] staff,[6] and leadership.[7]  *Id.*; Doc. 49 ¶ 14.

---

[2] Defendants move for summary judgment as to JNS on the additional grounds that Asiedu was never a JNS employee.  Asiedu argues that she was jointly employed by both JNS and Broadreach.  The Court need not address this argument, as it dismisses the instant action in its entirety for the reasons set forth herein.

[3] Savasta and Teen testified that Teen has no professional relationship with JNS.  Doc. 37 ¶ 9.  Asiedu asserts that the JNS website lists Teen as the Chief Operating Officer, which Savasta testified was an inadvertent mistake.  Doc. 49 ¶ 9.

[4] Although Asiedu partially disputes this fact on the basis that JNS and Broadreach were allegedly her joint employers, *id.* ¶ 10, she testified that she was never employed by JNS.  Doc. 36-2 at Tr. 21:2–4, 178:21–23.

[5] Teen testified that of Broadreach's 1,100 customers, JNS and Broadreach share 15 or 20.  Doc. 36-4 at Tr. 132:19–133:18.

[6] Savasta, Teen, and Rosanna Ramos testified that there are individuals who perform work functions for both Broadreach and JNS, such as managing the office and performing human resources functions.  Doc. 36-3 at Tr. 119:25–121:10; Doc. 36-4 at Tr. 131:15–132:15; Doc. 36-5 at Tr. 44:20–25.

[7] Although Savasta testified that he did not have a role in deciding promotions for Broadreach employees, he did have final decision-making authority with respect to raises and bonuses.  Doc. 46-4 at Tr. 180:8–182:24.  Savasta also testified that he never supervised Asiedu, *id.* at Tr. 178:3–5, nor did he have any involvement in determining her raise or performance evaluation.  *Id.* at Tr. 180:19–24, 183:12–14.  Savasta

### ii.   Asiedu's Employment at Broadreach

Asiedu first worked for Broadreach as a temporary employee in member services from 2005 to 2007.  Doc. 49 ¶ 15.  She became an employee on September 24, 2007 as a member or customer services representative.  *Id.*  Within member services, she was promoted, first to senior customer service representative in mid-2012, Doc. 46-3 at Tr. 33:12–17, and later to a team lead position in 2014, *id.* at Tr. 34:15–20.  Doc. 49 ¶ 17.  Asiedu received several promotions and accompanying increases in salary during her time at Broadreach.  *Id.* ¶¶ 17, 28.  In 2015, Teen created a new client services representative position that would interact directly with Broadreach's clients and selected her to fill this role, for which she did not receive a raise.  *Id.* ¶¶ 18, 27; *see also* Doc. 46-3 at Tr. 36:11–38:5.  The parties dispute whether the employees in member services, as opposed to client services, perform comparable work responsibilities and therefore receive similar compensation and whether Asiedu's new position in client services qualified as a promotion or a lateral transfer.  *Id.* ¶¶ 19, 22.  It is undisputed that Asiedu was the only person in this new role for Broadreach.  *Id.* ¶ 18.

It is undisputed that Asiedu emailed Teen on November 23, 2016, thanking him "for seeing [her] potential and moving [her] into Client management."  Doc. 36-6.  It is further undisputed that Teen had plans to promote Asiedu and move her up within Broadreach.  Doc. 49 ¶ 26.

### iii.   2012 Off-Site Assault

In 2012, Asiedu reported an off-site incident with Malcom Howard, a Black JNS employee, and Weslow Caple, a Black Broadreach employee, that occurred outside of work hours.  Doc. 37 ¶¶ 29–30.  Howard and Caple invited Asiedu to a house party at Howard's home.  Doc. 46-3 at Tr. 63:2–8.  At the party, Howard threw her on a bed and

---

and Teen testified that while Teen shared information with Savasta, Savasta was not involved in the day-to-day operations of Broadreach.  *See, e.g.*, *id.* at Tr. 181:6–8; Doc. 46-5 at Tr. 63:10–24.  Ramos testified that the ultimate decisionmaker for JNS was Savasta and for Broadreach Savasta and Teen.  Doc. 36-5 at Tr. 42:16–23.

groped her, and Caple made sexual comments and grabbed his genital area. *Id.* at Tr. 63:11–64:5. She reported that Howard sexually assaulted her and Caple sexually harassed her to Wayne Fleischman, her supervisor and the Chief Operating Officer at the time, and TriNet, Broadreach's outside human resources firm. *Id.* at Tr. 64:6–15. In response, an investigation was conducted. Doc. 37 ¶ 31. Caple was terminated after the investigation, *id.* ¶ 32; *see also* Doc. 46-3 at Tr. 66:19–22, and Howard lost his bonus as a result of his conduct. Doc. 37 ¶ 33; *see also* Doc. 46-3 at Tr. 66:23–67:1. Asiedu did not have any further issues with Howard after this incident. Doc. 37 ¶ 33.

### iv.    2014–2015 Spanish-Speaking Coworkers

Asiedu notes that from approximately 2014 to 2015 when she was the team lead in customer service, the call center representatives would speak only in Spanish among themselves despite knowing that she could not understand them. Doc. 49 ¶¶ 97, 99. She testified that there were situations where the representatives would laugh and speak in Spanish whenever she walked by. Doc. 46-3 at Tr. 92:23–25. She reported this situation to Broadreach management, including Savasta and Teen, regarding "a hostile call center environment" in which she was "isolated" as a result of the representatives speaking in Spanish. Doc. 49 ¶ 97; *see also* Doc. 36-15 at 4, 11–12. She testified that when she expressed her discomfort with the situation, she was told that the representatives were likely not talking about her in Spanish. Doc. 46-3 at Tr. 92:17–94:15. She asserts that she was told to focus on her work. Doc. 49 ¶ 97.

### v.    2016 Pornography Incident

In March or April 2016, Asiedu reported that she witnessed John Savasta, a white Broadreach employee and Savasta's brother, allegedly viewing pornography at work. *Id.* ¶¶ 34–35. After her report, Teen spoke with John Savasta, and John Savasta quit a few days later. *Id.* ¶¶ 36–37.[8]

---

[8] Asiedu testified that Teen told her that he could not fire John Savasta, because there was another Broadreach employee who was caught watching pornography and was not fired. Doc. 46-3 at Tr. 73:13–21.

### vi.    2016 Anonymous Email

On October 18, 2016, Asiedu received an anonymous email at her Broadreach email address that contained sexually harassing and racially discriminatory language in addition to a photograph of male genitals.  Doc. 37 ¶ 39.  The email from karimoux@yahoo.com stated:  "When you free to cum cream all over this dick?  You can choke on it when your two sisters are done, you idiot used up damaged goods.  You damn near 40 years old still out there being a lying ass loser lol.  Old broke ass hoodrat body odor having ugly bugged out blackface bitch."  Doc. 36-15 at 7.

After Asiedu reported the email to TriNet, Teen, and Rosanna Ramos, the director of operations at Broadreach, Broadreach conducted an investigation.  Doc. 37 ¶¶ 40–41.  However, NCIC, Broadreach's outside information and systems technology vendor, was unable to determine the source of the email without a court order.  Doc. 49 ¶ 41.  On October 20, 2016, Teen sent Asiedu an email regarding the steps Broadreach, TriNet, and NCIC had taken in their investigation, proposed blocking the email address from contacting Asiedu, and expressed that "this incident is not something the Company will stand for."  Doc. 37 ¶ 43; Doc. 36-11 at 2.  The undisputed evidence in the record shows that Asiedu responded in an email saying that she appreciated how Teen, Ramos, and NCIC "jumped to [her] aid on this matter," and that she would not "waste any more energy on this."  Doc. 49 ¶ 44; *see also* Doc. 36-11 at 2.  Although Asiedu concedes that immediate action was taken to initiate an investigation, she takes issue with Broadreach's alleged failure to take further action, specifically pursuing a court order or questioning JNS or Broadreach employees about the email.  Doc. 49 ¶¶ 41, 43–44.  She alleges that although she expressed interest in pursuing the court order, Teen allegedly tried to convince her to let it go.  *Id.* ¶ 41.  She asserts her belief that if this had happened to a white employee, more steps would have been taken to determine the identity of the sender.  *Id.* ¶ 44.

On October 24, 2016, Asiedu reported the email to TriNet.  Doc. 37 ¶ 45; *see also* Doc. 36-15 at 11–12.  While the parties dispute whether TriNet conducted a formal investigation during this time, on October 27, 2016, TriNet informed Asiedu that the investigation had concluded.  Doc. 49 ¶¶ 48–49.

In a November 7, 2016 memorandum memorializing the steps taken to address Asiedu's report regarding the email and her prior complaints, TriNet representative Elizabeth Perlak documented that NCIC had tracked the email to Yahoo and determined that there was no indication that the email came from someone at Broadreach.  Doc. 36-15 at 3.  In a conversation with Perlak, Asiedu expressed her belief that Bella, an employee with JNS, sent the email based on the fact that the email was sent to her work email address and a personal dispute that resulted from Asiedu damaging Bella's suitcase months prior.  *Id.*  Asiedu informed Perlak that she and Bella had a confrontation about the suitcase, but that they had not spoken since, and that she believed Bella may have been on vacation at the time of the email.  *Id.*  Perlak advised Asiedu that TriNet and Broadreach would not be able to obtain a court order for Yahoo to identify the email address holder.  *Id.* at 4.  Perlak further advised Asiedu to speak with her local police authority if she needed an order of protection and that Broadreach would cooperate to the extent possible.  *Id.*  Finally, Perlak assured Asiedu that if there was evidence that the email came from an individual associated with Broadreach, it would be handled appropriately.  *Id.*  The memorandum states that Teen had previously contacted TriNet about the email and to discuss Broadreach's responsibility to investigate if there was any indication that it came from someone internally.  *Id.* at 2.  Following her conversation with Asiedu, Perlak discussed the complaint with Teen and Ramos and determined that there was not enough information to reasonably conclude that any Broadreach employee was involved.  *Id.* at 4–5.  Accordingly, they decided against interviewing Bella.

### vii.    2017 Exclusion from Meetings and Removal of Responsibilities

Asiedu notes that once she started working with Bill Perkins, the newly hired white Chief Operating Officer of Broadreach in 2017, he informed her that she was no longer invited to management meetings and removed certain of her responsibilities, specifically managing a computer program.  Doc. 49 ¶ 101; Doc. 46-3 at Tr. 119:23–125:16; Doc. 46 at 7.[9]  Although Perkins asked her to do a presentation to show him her familiarity with the computer program, she testified that the presentation went well and that he seemed impressed.  Doc. 46-3 at Tr. 121:24–122:18.  Moreover, she further testified that after missing approximately two or three meetings, she was invited back.  *Id.* at Tr. 125:13–16.

### viii.    2017 Urination Incident

On November 15, 2017, Perkins, urinated on Asiedu when they were on the escalator at New York Penn Station after returning from a work meeting in Philadelphia.  Doc. 37 ¶ 56.  Kali Panagos, another Broadreach employee, witnessed the incident.  Doc. 49 ¶ 58.  Asiedu testified that Panagos got on the escalator first, followed by herself then Perkins.  Doc. 46-3 at Tr. 133:7–12.  She further testified that she felt a warm substance going down her legs and into her shoes, then she turned around and asked Perkins if he had urinated on her.  *Id.* at Tr. 132:22–133:17.  Perkins denied urinating on her, and she observed that he was adjusting his unbuttoned and unzipped pants .  *Id.* at Tr. 133:18–134:7.  Asiedu and Panagos went back to Broadreach's office and called Teen to report the incident.  Doc. 37 ¶ 57.  Although Asiedu and Teen provided conflicting testimony regarding whether Panagos informed Teen that she had seen Perkins urinate on Asiedu, Doc. 49 ¶ 58, Panagos submitted an affidavit in which she confirms the substance of Asiedu's testimony and states that she told Teen that Perkins "did absolutely urinate on

---

[9] Asiedu only briefly discusses how Perkins no longer allowed her to join meetings.  Doc. 49 ¶ 101.  In the Complaint, she details how Perkins removed responsibilities from her, questioned her abilities, and removed her from management meetings.  Doc. 1 ¶¶ 31–38.  Although she alleges that he treated her differently from non-Black, male employees, she does not provide details regarding these other employees.

[Asiedu]."  Doc. 48 ¶ 5.  Teen testified that he made several unsuccessful attempts to contact Perkins that evening.  Doc. 46-5 at Tr. 279:24–280:6, 280:15–18.

The parties dispute the circumstances under which Teen met with Perkins the following morning.  Doc. 49 ¶¶ 60–61.  While Teen testified that Perkins was in the office for a previously scheduled meeting with a vendor, Doc. 37 ¶ 60 and Doc. 46-5 at Tr. 281:5–7, Asiedu testified that she witnessed Teen and Perkins, among others, laughing and talking.  Doc. 49 ¶ 65.  She further testified that Teen expressed annoyance and doubt and advised that Perkins had denied her allegations when she questioned him about why Perkins was in the office and informed him that she had filed a police report.  Doc. 46-3 at Tr. 149:22–150:21.  Teen denied being upset that she had filed a police report and testified that he was fully supportive of her.  Doc. 46-5 at Tr. 331:21–335:11.  That day, Savasta learned of the urination incident from Panagos and Asiedu and expressed that it was "unacceptable."  Doc. 49 ¶ 61.  Savasta testified that after this conversation, he told Teen that Perkins should not have been allowed into the office and that he needed to be terminated immediately.  Doc. 46-4 at Tr. 291:1–6, 294:18–295:4.  Teen testified that he removed Perkins.  Doc. 46-5 at Tr. 286:18–19, 288:13–18.

Later that same day, Teen informed Asiedu that Perkins had been removed from his position.  Doc. 49 ¶ 63.  Afterward, Asiedu did not encounter Perkins again.  *Id.* ¶ 65. The parties dispute the extent to which Asiedu received support from Teen following the urination incident, *see, e.g.*, *id.* ¶¶ 66–67, and the exact point at which Perkins was terminated.  *Id.* ¶¶ 62–63.  Although Asiedu concedes that Perkins was terminated after Savasta was informed of the incident, *id.* ¶ 63, she asserts that Perkins was allowed to continue conducting business for Broadreach.  *Id.* ¶ 66.  Teen testified that he reached out to TriNet to conduct an investigation into the incident, which took several weeks and resulted in Perkins' termination.  Doc. 46-5 at Tr. 329:13–331:20.

In an email dated November 16, 2017 to Savasta, copying Teen, Perkins wrote:  "I am sorry for the events that have transpired. . . . At the end of the day, I am guilty as

charged.  I'm not going to fight anything."  Doc. 46-7 at 1.  Although Teen conceded that

it was *Broadreach's* position that Perkins had admitted to urinating on Asiedu, Doc. 46-5

at Tr. 294:10–20, he repeatedly denied that Perkins had ever admitted anything to *him*.

*Id.* at Tr. 288:25–289:3, 291:8–13, 291:25–292:4, 293:3–4, 295:2–9.  On the other hand,

Savasta testified that he construed Perkins' email to be an admission to urinating on

Asiedu.  Doc. 46-4 at Tr. 398:16–399:6.

　　　　Teen testified that, during the course of the investigation, Perkins expressed that

there may be an issue with his employment regardless of the urination incident, as his

former employer was "coming after" him.  Doc. 46-5 at Tr. 271:10–16, 273:3–19.  On

November 17, 2017, Teen emailed Broadreach employees that Perkins had received a

letter from his prior employer about his potential violation of a non-compete agreement

and was therefore "removed as an executive with any direct reports or involvement with

[Broadreach]."  Doc. 46-8 at 1.  Teen further explained that he gave Perkins a few weeks

"to wrap up some projects."  *Id.*  The parties dispute the reason for Broadreach's

communication to its employees as to why Perkins was no longer employed.  Doc. 49 ¶

66.  While Defendants assert that Teen consulted with Asiedu about this communication,

Asiedu denies this.  *Id.*  Teen testified that this was the "public answer" given to

Broadreach employees, because it was "an elegant way to preserve some dignity for

[Asiedu]" that Asiedu agreed with.  Doc. 46-5 at Tr. 270:14–273:24.  On the other hand,

Asiedu disputes this testimony, asserting that Teen never consulted her concerning this

"public lie."  Doc. 49 ¶ 66.

### ix.　　2017–2018 Asiedu's Various Requests

　　　　In December 2017 or January 2018, after Panagos resigned, Teen informed

Asiedu that this was an opportunity for her to "step up" and be the "face of

[Broadreach]."  *Id.* ¶ 69.  During this meeting, Asiedu requested a raise, which Teen

denied.  *Id.* ¶ 70.  The parties dispute whether a future raise was acknowledged.  *Id.* ¶ 71.

While Asiedu testified that Teen told her "let me see what else you can do," he testified

9

that he informed her that she would likely receive a raise in April when Broadreach usually determines raises.  *Id.*  Asiedu notes that the only wage increases she received while working for Teen were cost-of-living increases and annual bonuses, which everyone receives.  *Id.* ¶¶ 28, 71.

Without pointing to any evidence in the record, Asiedu asserts that another Broadreach employee, Michael Fendrich, was promoted several times and received accompanying salary increases.  *Id.* ¶ 96.  Defendants submitted a comparison chart that was produced in discovery, showing the compensation of Asiedu, Jacques Aboaf, Neil Savasta, and Jessica Sylvester.  Doc. 52-1 at 8–9.[10]  Asiedu and Sylvester were customer service specialists, Aboaf a manager, and Neil Savasta a chief technology officer. ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████  *Id.*; *see also*

Doc. 36-7.  No salary information is provided for Fendrich.

In addition, some time after her transition into client services and again after Panagos' resignation, Asiedu requested that she have her own office, which Teen denied. Doc. 49 ¶¶ 72, 74.  The parties heavily contest whether Asiedu's position warranted a private office, specifically whether she worked with confidential health information as part of her duties and responsibilities and whether there was available office space.  *Id.* ¶ 73.  Asiedu alleges that she needed an office because it was "challenging" to perform her responsibilities as a result of "traffic, conversations, and tons of distractions."  *Id.*  She also testified that she requested an office for confidentiality purposes, as she needed a

---

[10] This information concerning compensation was provided in Defendants' reply to address Asiedu's allegation that she was paid less than her white colleagues, which she raised for the first time in her opposition papers.  Doc. 46 at 13.

quiet space.  Doc. 46-3 at Tr. 50:19–51:9.  She asserts that not only did she handle protected health information, but there were two or three vacant offices, one of which was given to Aboaf, a white, part-time employee[11] who was not an executive and worked on developing programs with Teen.  Doc. 49 ¶¶ 73–75.  Teen further testified that he was planning to surprise Asiedu with her own office once space became available, Doc. 36-4 at Tr. 153:6–11, while Asiedu testified that there were already vacant offices.  Doc. 46-3 at Tr. 47:21–48:2.

The parties dispute whether Asiedu's job duties and responsibilities required regular travel or the use of a personal cell phone.  *Id.* ¶ 23.[12]  She asserts that the use of her personal phone was necessary and required, as she traveled to meetings and fairs as part of her role, but that only certain people were reimbursed.  *Id.*  She testified that anyone who was in the account management department had their phone bills paid.  Doc. 36-2 at Tr. 57:17–22.  Asiedu testified that aside from herself, the only account manager, Broadreach paid the phone bills of other non-Black individuals in the same department, specifically the director of operations, Beth McKnight, the data analyst, Fendrich, and the clinical pharmacists, Panagos and Elliot Berkovits.  *Id.* at Tr. 36:23–25, 57:25–59:6.  Asiedu conceded that her understanding was based on conversations with Fendrich who told her that his bill was paid for by Broadreach and Panagos who informed her that Panagos, McKnight, and Berkovits could have their bills paid for.  *Id.* at Tr. 60:7–61:5.  In contrast, Teen testified that Broadreach paid for his, Berkovits', and perhaps Fendrich's phone bills, due to the nature of their roles, which required them to be "on call" and accessible around the clock.  Doc. 36-4 at Tr. 170:18–175:11, 177:5–20; Doc. 46-5 at Tr. 167:3–168:21.  He further testified that even sales employees who travel, such

---

[11] In the compensation comparison chart submitted by Defendants, Aboaf is identified as a full-time employee and a manager.  Doc. 52-1 at 9.  Teen testified that Aboaf was the department leader for Broadreach's product development.  Doc. 46-5 at Tr. 70:19–20.

[12] Asiedu contends, for the first time in her opposition, that she was not given a company credit card like her white male colleagues.  Doc. 46 at 13.

as Aboaf, do not have their bills paid.  Doc. 36-4 at Tr. 170:18–171:3, 171:24–172:3.

Meanwhile, Savasta testified that although he "wouldn't really know" the specific

employees who had their phone bills paid, senior staff and salespeople would generally

have their bills paid for.  Doc. 36-3 at Tr. 271:9–23.  It is undisputed that on one

occasion, Broadreach paid Asiedu's phone bill so that she would have service for a

business trip, although the parties characterize the incident differently.  Doc. 49 ¶ 24.

### x.     2018 Asiedu's Termination

Asiedu testified that during a conversation with Berkovits, she informed him that

she did not appreciate Teen's response to and handling of the urination incident.  Doc.

46-3 at Tr. 155:14–156:17.  She further testified that when Berkovits proposed speaking

with Savasta about the situation, she agreed.  *Id.* at Tr. 158:6–11.  Teen testified that

Berkovits informed him that Asiedu was still upset about the urination incident.  Doc. 46-

5 at Tr. 350:17–351:17.

On February 8, 2018, Teen asked Asiedu about her conversation with Berkovits,

and she stated that she was not over the urination incident with Perkins.  Doc. 49 ¶ 76.[13]

The parties dispute the characterization of this conversation.  While Asiedu testified that

she informed Teen that she did not appreciate how he maintained relations with Perkins

and acted aggressively toward her the morning after the urination incident, Doc. 46-3 at

Tr. 160:3–16, Teen testified that he asked her how he could have done more and

expressed sadness that she had never brought this issue to his attention beforehand in

light of the fact that he had always supported her and sought to set her up for success.

Doc. 46-5 at Tr. 354:4–19, 355:2–21, 366:8–367:3.  Asiedu further testified that Teen

---

[13] Asiedu asserts in her opposition papers that she told Teen that he would have handled things differently if Panagos had been urinated on because she is white.  Doc. 49 ¶ 76.  However, according to Asiedu's deposition testimony, which she cites in support of this assertion, Asiedu told Teen that he would not have handled the incident this way if Panagos was urinated on.  Doc. 46-3 at Tr. 160:13–16.  When defense counsel asked "[a]nd why is that?", Asiedu testified "[b]ecause in [her] head, [she is] a black woman and [Panagos is] a white woman and [she] just felt strongly that if it was the other way around, that it would not have been handled the way that it was handled."  *Id.* at Tr. 160:17–23.

accused her of pretending to still be affected and insisted that he had supported her in response to the urination incident when Broadreach had not supported her in response to the 2012 sexual assault. Doc. 46-3 at Tr. 162:10–21, 163:5–7. The parties dispute whether Teen told her that she needed to get over the incident and that he was considering repositioning her within Broadreach. *Id.* at Tr. 163:4–25; Doc. 46-5 at Tr. 359:21–360:4, 368:14–17. She testified that she informed Teen that the incident had not impacted her work or her work relationship with him. Doc. 49 ¶ 77.

After her conversation with Teen, she went to Fendrich's office and expressed her fear that Teen was going to fire her as a result of their meeting. Doc. 46-3 at Tr. 164:17–165:5; *see also* Doc. 36-17. Fendrich advised that Teen is very forgiving and that she should continue doing her work. Doc. 46-3 at Tr. 165:5–9; *see also* Doc. 36-17. One week later, in an email to Savasta dated February 15, 2018, Fendrich memorialized his conversation with Asiedu, stating that she explained that "the outcome of [Asiedu's and Teen's] conversation was such that she felt their relationship may have been damaged greatly based on her actions," and that "[Teen] is the only boss [she has] had in this company that ever promoted [her]." Doc. 36-17.

On February 12, 2018, Asiedu approached Ramos about her conversation with Teen and whether she should report it to Savasta. Doc. 49 ¶ 79; *see also* Doc. 46-3 at Tr. 165:13–166:11. Defendants assert that during this conversation, Asiedu referred to Teen as a "big fat fuck" or "fat fuck," Doc. 49 ¶ 79, and that Ramos informed Savasta thereof. *Id.* ¶ 81. Ramos testified that Asiedu called Teen these names. Doc. 46-6 at Tr. 223:21–224:7. In addition, Ramos' and Savasta's declarations dated October 9 and October 8, 2020, respectively, state that Asiedu referred to Teen as a "fat fuck" during her conversation with Ramos. Doc. 36-19 ¶¶ 3–4; Doc. 36-20 ¶ 3. Attached to Ramos' declaration are her notes memorializing the conversation, which similarly state that

13

Asiedu referred to Teen by this derogatory term.  Doc. 36-19 at 5.[14]  Moreover, Asiedu does not dispute this.  Instead, when asked whether she had ever called Teen this name, Asiedu testified that she did not recall.  Doc. 49 ¶ 79; Doc. 36-2 at Tr. 166:15–23.

On the same day as Asiedu's conversation with Ramos, Savasta and Asiedu held a meeting during which she was terminated.  The parties dispute the timing of when Ramos informed Savasta that Asiedu had referred to Teen by this name.  Doc. 49 ¶¶ 81–82.  According to Ramos' and Savasta's declarations, Ramos immediately notified Savasta.  Doc. 36-19 ¶¶ 3–4; Doc. 36-20 ¶ 3.  However, as Asiedu argues, Ramos testified that she spoke with Savasta concerning her conversation with Asiedu only after Asiedu had already spoken with Savasta and was terminated.  Doc. 46-6 at Tr. 227:10–23, 228:4–7, 229:2–10.  Ramos further testified that she did not tell anyone about her conversation with Asiedu before her termination.  *Id.* at Tr. 229:11–230:21.  Savasta testified that three employees, Berkovits, Ramos, and Fendrich, informed him within a day or two before his meeting with Asiedu that Asiedu had referred to Teen in these disparaging terms.  Doc. 36-3 at Tr. 329:23–331:14.  However, as Asiedu points out, in Fendrich's email to Savasta memorializing his February 8, 2018 conversation with Asiedu, nowhere does he mention that Asiedu called Teen any name.  Doc. 36-17; *see also* Doc. 49 ¶ 82.

Relatedly, the parties dispute the reason for which Asiedu was terminated.  Defendants assert that Asiedu was terminated for lying, because she first denied, then later admitted to, calling Teen names when asked by Savasta.  Doc. 49 ¶¶ 84–89.  Savasta testified that during his meeting with Asiedu, he asked her whether she had referred to Teen as a "fat fuck."  Doc. 36-3 at Tr. 326:9–14.  Although she allegedly denied making

---

[14] Asiedu notes that, contrary to Ramos' and Savasta's declarations, Doc. 36-19 ¶ 4 and Doc. 36-20 ¶ 3, Ramos testified that the notes of her February 12, 2018 conversation with Asiedu were written *after* the instant action was filed, not on the day of the conversation.  Doc. 46-6 at Tr. 234:13–18, 236:9–11.  Defendants argue that Ramos was confused about the timeline and that following the deposition, Ramos' notes were produced in native format in discovery, with the metadata confirming that they were created on March 8, 2018, Doc. 52 at 12, which was approximately three weeks after their conversation but before this action was filed.

the statement at first, she later admitted to it.  *Id.* at Tr. 326:14–327:16.  Savasta then

fired her for lying to him.  *Id.* at Tr. 327:16–328:15.  On the other hand, Asiedu alleges

that at no point did Savasta mention the alleged name-calling during their meeting, and

therefore she never lied, or admitted to lying, to Savasta.  Doc. 49 ¶¶ 84–89.  Instead, she

asserts that Savasta terminated her because he said he did not see how she and Teen could

work together.  *Id.*  Asiedu testified that during their meeting, Savasta accused her of

"trying to rally support in the office" by telling people about the urination incident.  Doc.

46-3 at Tr. 168:14–25.  She further testified that Savasta repeatedly stated that he could

not see how she and Teen could continue to work together.  *Id.* at Tr. 169:14–25.  She

testified that at no point did Savasta ask her whether she had referred to Teen in

derogatory terms or express concerns that she was lying.  *Id.* at Tr. 170:5–10.

   Asiedu testified that it would be a violation of Broadreach's policies for an

employee to lie at work or call a supervisor inappropriate names.  *Id.* at Tr. 32:9–33:4.  It

is undisputed that Howard, a JNS employee who lied to Savasta about mismanaging the

delivery of materials to a new client, was terminated.  Doc. 49 ¶ 92; *see also* Doc. 46-4 at

Tr. 211:10–214:9.  Savasta testified that "the key was that [Howard] lied to me about his

management and that is a no-no.  So, I let him go."  Doc. 46-4 at Tr. 211:11–17.

### xi.   Asiedu's Concerns of Gender and Race Discrimination

   During her deposition, Asiedu testified that she did not recall ever reporting any

complaints to anyone at Broadreach or TriNet that she was being discriminated against

on the basis of her gender or race.  Doc. 49 ¶¶ 96–97.[15]  She also testified that she did not

recall whether Teen ever did anything to make her think he would treat her differently on

the basis of her race and gender.  *Id.* ¶ 99.[16]

---

[15] Although Asiedu now disputes her own testimony, her reasoning relies largely on conclusory arguments
that certain incidents set forth herein constituted discrimination.  Doc. 49 ¶¶ 96–97 ("it is clear that I was
discriminated against as a woman").

[16] Asiedu partially disputes her own testimony on the basis that working on this case has made her recall
her mistreatment due to her race.  *Id.* ¶ 99.

### B.  Procedural Background

Asiedu brought the instant action on December 20, 2019.  Doc. 2.  Defendants answered the Complaint on April 16, 2020.  Doc. 13.  Defendants moved for summary judgment on February 4, 2022.  Doc. 34.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might "affect the outcome of the litigation under the governing law."  *Id.* (quoting *Miner v. Clinton County N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)).  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material

facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

Courts hold submissions by *pro se* litigants to "less stringent standards than formal pleadings drafted by lawyers." *Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993) (quoting *Hughes v. Rowe*, 449 U.S. 5, 9 (1980)).  Courts must give "special solicitude" to *pro se* litigants in connection with motions for summary judgment.  *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010).  A *pro se* party's papers opposing summary judgment are to be read liberally and interpreted to "raise the strongest arguments that they suggest." *Clinton v. Oppenheimer & Co. Inc.*, 824 F. Supp. 2d 476, 481 (S.D.N.Y. 2011) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)). However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).  Thus, the special solicitude afforded *pro se* parties is not unlimited and does not "relieve" a plaintiff of his or her "duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted).  "Nor is the 'duty to liberally construe a plaintiff's [opposition] . . . the equivalent of a duty to re-write it.'" *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 65 (S.D.N.Y. 2016) (quoting *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009)).

## III.   DISCUSSION

### A.  Discrimination Claims[17]

Asiedu's employment discrimination claims pursuant to Title VII, Section 1981, and the NYSHRL are properly analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[18]  Under the *McDonnell Douglas* framework, a plaintiff alleging discrimination must first demonstrate a *prima facie* case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  The Second Circuit has explained that a plaintiff's burden at this stage is *de minimis*.  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001). Nonetheless, in order to state a *prima facie* case for discrimination, "a plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive," *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001), *aff'd*, 51 F. App'x 55 (2d Cir. 2002), and "cannot meet its burden through reliance on unsupported assertions."  *Goenaga*, 51 F.3d at 18.  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) (quoting *Bikerstaff v. Vassar College*, 196 F.3d 435, 451–52 (2d Cir. 1999)).  "A plaintiff's self-serving statement, without direct or circumstantial evidence to support the charge," is also insufficient.  *Fincher v. Depository Trust & Clearing Corp.*, No. 06 Civ. 9959 (WP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008).

---

[17] In opposition, Asiedu contends that she has discrimination claims under the New York City Human Rights Law ("NYCHRL").  Doc. 46 at 5.  However, she did not assert these claims in the Complaint.  Doc. 2 at 4.  Thus, the Court finds that Asiedu did not bring claims pursuant to the NYCHRL.

[18] *See, e.g.*, *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (analyzing Title VII and Section 1981 claims under same framework); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008) (treating Title VII and NYSHRL discrimination claims identically).

If a plaintiff successfully presents a *prima facie* case of discrimination, the defendant must then rebut the presumption by offering legitimate and non-discriminatory reasons for the adverse employment action demonstrated in plaintiff's *prima facie* case. *Abdu-Brisson*, 239 F.3d at 468 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  "The employer need not *persuade* the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior."  *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (emphasis in original).  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).  To satisfy the second step of *McDonnell Douglas*, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  *Burdine*, 450 U.S. at 254.  "If the defendant carries this burden of production, the presumption [of discrimination] raised by the *prima facie* case is rebutted," and "drops from the case."  *Id.* at 255 n.10.

Under the third step of the *McDonnell Douglas* framework, the burden then shifts back to the plaintiff to prove intentional discrimination by a preponderance of the evidence.  *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 121 (2d Cir. 1997).  The Second Circuit has explained that "there are two distinct ways for a plaintiff to prevail—'either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions.'"  *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (quoting *Fields*, 115 F.3d at 121).  It is important to note, that "[a]lthough intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530
U.S. at 143 (quoting *Burdine*, 450 U.S. at 253).

### i.    *Prima Facie* **Case of Discrimination**

To prove a *prima facie* case of discrimination, a plaintiff must show that:  (1) she
is a member of a protected class; (2) she was qualified for the position in question; (3) she
suffered an adverse employment action; and (4) the adverse action took place under
circumstances giving rise to an inference of discrimination.  *Ruiz v. Cty. of Rockland*, 609
F.3d 486, 491–92 (2d Cir. 2010) (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir.
2008)).  The first three elements of a *prima facie* case are not in contention.  It is
undisputed that Asiedu was a member of a protected class, because she is a Black
woman.  It is also clear from the record that Asiedu was minimally qualified for the
position based on, among other things, Savasta's and Teen's deposition testimony that she
was viewed as a valued employee and her performance was, at a minimum, satisfactory.
Doc. 49 ¶¶ 18, 26–27.

As for the third element, Asiedu alleges in the Complaint that Defendants' adverse
employment actions included the termination of her employment and the provision of
terms and conditions of employment that differed from those of similar employees.  Doc.
2 at 5.  Defendants only address her termination as the alleged adverse action at issue in
their opening papers.[19]  However, based on the allegations in the Complaint and Asiedu's
papers, the Court construes the discriminatory conduct alleged to include Defendants'
alleged (1) failure to properly investigate and resolve issues related to the 2012 sexual
assault, 2016 pornography incident, 2016 anonymous email, and 2017 urination incident;
(2) failure to give her a promotion-based raise; (3) failure to provide her with certain
benefits, such as an office and payment of phone bills; (4) exclusion from meetings and
removal of certain responsibilities; and (5) termination of her employment.

---

[19] In their reply, Defendants address additional examples of alleged mistreatment.  *See* Doc. 52.

Defendants challenge the fourth requirement of the *prima facie* case, arguing that Asiedu has not offered any admissible evidence suggesting that any alleged adverse action, specifically her termination, was motivated by animus based on race or gender.

The Court finds that Asiedu has failed to adduce any admissible evidence in support of a *prime facie* case of discrimination.

### *Failure to Investigate Various Incidents*

"To the extent that [Asiedu] alleges that [Defendants] did not properly investigate [her] complaint[s], such conduct does not constitute an adverse employment action for purposes of stating a *prima facie* case of employment discrimination." *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 379 n.4 (S.D.N.Y. 2013) (collecting cases); *see also Rogers v. Fashion Inst. of Tech.*, No. 14 Civ. 6420 (AT), 2016 WL 889590, at *5 (S.D.N.Y. Feb. 26, 2016) (failure to investigate "does not constitute an adverse employment action under the [ ] definition applied to discrimination claims.").

However, while the failure to investigate does not itself constitute an adverse employment action, the Second Circuit has held that "[t]he failure of an employer to conduct an adequate investigation or to undertake an appropriate response can constitute evidence in support of a Title VII plaintiff's allegations." *Wagh v. Wilkie*, No. 18 Civ. 7726 (RWL), 2020 WL 5732035, at *15 (S.D.N.Y. Sept. 24, 2020) (alterations in original) (quoting *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009)); *see also Mandell v. County of Suffolk*, 316 F.3d 368 (2d Cir. 2003) (finding that leadership's failure to take any concrete action to remedy anti-Semitism within their department despite being aware thereof was proof of defendants' anti-Semitic bias); *Henderson v. Montefiore Med. Ctr.*, No. 12 Civ. 1468 (HB), 2013 WL 1155421, at *4 (S.D.N.Y. Mar. 21, 2013) (holding that employer's lack of response to plaintiff's complaints about racial bias in the peer-review process, including failure to investigate or report claims to any human resources personnel, was sufficient evidence of discriminatory racial animus); *Collins v. Cohen Pontani Lieberman & Pavane*, No. 04 Civ. 8983 (KMW) (MHD), 2008

WL 2971668, at \*12 (S.D.N.Y. July 31, 2008) (finding that supervisor's failure to investigate plaintiff's complaint that denial of salary increase and promotion was a result of sex discrimination strengthened inference of discriminatory animus).

Here, the Court finds the 2012 sexual assault, 2016 pornography incident, 2016 anonymous email, and 2017 urination incident undoubtedly disturbing and unacceptable.[20]   However, to the extent Asiedu contends that these incidents were not properly investigated and therefore evidence discrimination, this argument fails.  As a threshold matter, it is clear that Defendants investigated her claims.

As noted above, in response to the 2012 sexual assault, it is undisputed that an investigation was conducted, and that as a result of the investigation, Caple was terminated and Howard lost his bonus.  Doc. 49 ¶¶ 31–33.  It is further undisputed that Asiedu did not have any further issues with Howard after this incident.  *Id.* at ¶ 33.

In response to the 2016 pornography incident, it is undisputed that after Asiedu reported the issue, Teen spoke with John Savasta who quit a few days after.  *Id.* ¶¶ 36–37.

In response to the 2016 anonymous email, the undisputed evidence in the record shows that concrete steps were taken in order to identify the anonymous source of the email and block the email address from further contacting Asiedu.  *Id.* ¶¶ 41, 43.  In the first instance, Broadreach's outside information and systems technology vendor investigated the email but was unable to determine its source.  *Id.* ¶¶ 41, 43; *see also* Doc. 36-11.  When Asiedu subsequently reported the email to TriNet, TriNet communicated with her and later wrote a memorandum detailing the steps that were taken to investigate

---

[20] To the extent Asiedu argues that Broadreach failed to take action in response to her complaints regarding the customer service representatives speaking in Spanish, she fails to show how, if at all, this conduct, and Broadreach's alleged failure to address this conduct, is evidence of discrimination on the basis of her race. *See, e.g.*, *Toyama v. Hasaki Rest., Inc.*, No. 13 Civ. 4892 (AKH), 2014 WL 7234602, at \*3 (S.D.N.Y. Dec. 18, 2014) (dismissing hostile work environment claim where plaintiff speculated that she was called "Spanish bad words" but did not actually know what the employees were saying); *Bailey v. Huntington Hebrew Congregation*, No. 09 Civ. 839 (JS) (ETB), 2011 WL 2893003, at \*5 (E.D.N.Y. July 12, 2011) (dismissing discrimination claims where co-workers spoke in Spanish but did not say anything racially derogatory toward plaintiff).

her report.  Doc. 49 ¶¶ 45, 48–50; *see also* Doc. 36-14–15.  As set forth above, the memorandum noted, *inter alia*, the following:  Teen had previously contacted TriNet to discuss Broadreach's responsibility to investigate if there was any suggestion that the email came from someone internally; Broadreach's technology vendor had concluded that there was no indication that it came from someone at Broadreach; Asiedu believed that Bella, a JNS employee, sent the email because of a personal dispute they had several months prior; TriNet advised Asiedu that it and Broadreach would not be able to acquire a court order for Yahoo to identify the email address holder; and TriNet further advised Asiedu that if there was additional evidence that the email came from an employee it would be handled appropriately.  Doc. 36-15.  In fact, Asiedu admits in her papers that "immediate action was taken to initiate an investigation," but takes issue with the alleged "fail[ure] to do a full investigation once it required labor on [Broadreach's] part," specifically that Teen did not pursue a court-ordered subpoena in order to identify the sender or question any employees about sending the email.  Doc. 49 ¶¶ 41, 44.  The memorandum set forth that Teen and TriNet determined, based on the investigation and their discussions with Asiedu, that there was not enough information to reasonably conclude that any Broadreach employee was involved.  Doc. 36-15.

In response to the 2017 urination incident, it is undisputed that Perkins was removed from his position the very next day.  Doc. 49 ¶¶ 63, 66–67.  Teen testified that he reached out to TriNet to conduct an investigation and determine Broadreach's next steps, which took several weeks and ultimately resulted in Perkins' termination.  Doc. 46-5 at Tr. 329:13–331:20.  Asiedu takes issue with the fact that Perkins continued to work for Broadreach for several weeks and that the proffered reason for his termination was that he had violated a non-compete agreement with his former employer.  Doc. 49 ¶¶ 62, 66.  She also asserts that she did not receive support from Broadreach after the incident, because she was not told that she could take time off.  *Id.* ¶ 67.

While the Court agrees with Asiedu that these incidents are harmful and deplorable, it is clear that Defendants investigated her complaints.  Unlike cases in which courts have found that the defendant's failure to investigate evidenced discrimination, here, Defendants promptly conducted investigations and terminated or otherwise disciplined responsible individuals.  *See, e.g.*, *Wagh*, 2020 WL 5732035, at *16 (finding discriminatory animus where there was no evidence that the decisionmaker for raises took any steps to investigate plaintiff's complaint that his pay discrepancy reflected discrimination); *Henderson*, 2013 WL 1155421, at *4 (holding that there was sufficient evidence of racial animus where the supervisor neither personally investigated nor reported plaintiff's allegations about racial animus in the peer-review process to human resources, as mandated by the employer's antidiscrimination policies); *Collins*, 2008 WL 2971668, at *12 (finding that supervisor's failure to investigate sex discrimination complaint in accordance with the employer's discrimination policy established an inference of discrimination).

Asiedu cites no evidence in the record that this alleged failure to investigate was based on her race or gender, such as, for example, evidence that Defendants did investigate complaints by non-Black male employees or complaints about non-gender or non-race based discrimination.  *See Hess v. Mid Hudson Valley Staffco LLC*, No. 16 Civ. 1166 (KMK), 2018 WL 4168976, at *16 (S.D.N.Y. Aug. 30, 2018) (collecting cases), *aff'd*, 776 F. App'x 36 (2d Cir. 2019).  Nor does she establish that in her complaints regarding these incidents she claimed that she was discriminated against by Defendants on the basis of her race or gender.  *See Eka v. Brookdale Hospital Medical Center*, 247 F. Supp. 3d 250, 268 (E.D.N.Y. 2017) (rejecting argument that failure to investigate allegations of discrimination could serve as basis to establish *prima facie* case where complaints "never mentioned [plaintiff's] national origin or claim that [defendant] was discriminating or retaliating against him on the basis of his national origin").  In fact, Asiedu testified that she did not recall ever reporting any complaints to anyone at

Broadreach or TriNet that she was being discriminated against on the basis of her gender or race.  Doc. 49 ¶¶ 96–97.

### Failure to Provide a Salary Increase

Asiedu alleges that Defendants discriminated against her, because Teen denied her multiple requests for a salary increase in conjunction with her promotion.  Doc. 49 ¶ 96.

A plaintiff may raise an inference of discrimination for the purposes of making out a *prima facie* case by relying on the theory of disparate treatment; that is, by showing that her employer treated her less favorably than a similarly situated employee outside her protected group.  *Mandell*, 316 F.3d at 379.

When a plaintiff seeks to establish her *prima facie* case by reference to the disparate treatment of an allegedly similarly situated employee, "the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001).  "This means that such an employee must be similarly situated in all material respects—not in all respects and that a plaintiff is not obligated to show disparate treatment of an identically situated employee." *Kearney v. ABN AMRO, Inc.*, 738 F. Supp. 2d 419, 426 (S.D.N.Y. 2010) (quoting *McGuinness*, 263 F.3d at 54) (internal quotation marks omitted).  Further, such employee "must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *Id.* (quoting *McGuinness*, 263 F.3d at 54) (internal quotation marks omitted).  "Employment characteristics which can support a finding that two employees are 'similarly situated' include similarities in education, seniority, performance, and specific work duties and similar requirements for skill, effort and responsibility for jobs performed under similar working conditions." *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 580 (S.D.N.Y. 2013) (internal citation and quotation marks omitted); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) ("What constitutes 'all material respects' . . . varies somewhat from case to case,"

but "there should be an 'objectively identifiable basis for comparability.'") (citations omitted).  This is generally a question of fact for the jury, but "[t]his rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."  *Britt v. Merrill Lynch & Co., Inc.*, 08 Civ. 5356 (GBD), 2011 WL 4000992, at *6 (S.D.N.Y. Aug. 26, 2011) (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007)) (internal quotation marks omitted).

"Failure to provide an employee with a raise may constitute an adverse employment action where Plaintiff can show that she was denied a salary increase received by similarly situated individuals as a result of discrimination."  *Potash*, 972 F. Supp. 2d at 583 (dismissing on summary judgment the plaintiff's claim that she was undercompensated on the basis of her gender in part because she failed to identify other employees or their duties); *see also Rooney v. Brown Grp. Retail, Inc.*, No. 08 Civ. 484 (DRH) (AKT), 2011 WL 1303361, at *11 (E.D.N.Y. Mar. 31, 2011) (dismissing on summary judgment the plaintiff's discrimination claim based on failure to provide a raise where the plaintiff provided no evidence that others received a raise).

Asiedu fails to identify any comparators with whom she claims she was similarly situated.  Without evidentiary support, she alleges in her papers that Fendrich received accompanying salary increases when he was promoted several times.  Doc. 49 ¶ 96.  Even if true, Asiedu and Fendrich were in no way similarly situated.  Fendrich was a white data analyst in the same department as Asiedu and is the current Chief Operating Officer.  Doc. 36-2 at Tr. 58:20–25; Doc. 36-3 at Tr. 83:15.  It is undisputed that Asiedu was the only customer service representative at the time.  Doc. 49 ¶¶ 18, 27.

Furthermore, based on the compensation comparison chart submitted by Defendants, it does not appear that Broadreach paid other employees promotion-based raises, let alone any similarly situated employees.  Doc. 52-1 at 8–9.  ███████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ *Id.*  Asiedu has failed to

present any evidence that a similarly situated employee received a salary increase.

*Inguanzo v. Hous. & Servs., Inc.*, No. 12 Civ. 8212 (ER), 2014 WL 4678254, at *14

(S.D.N.Y. Sept. 19, 2014), *aff'd*, 621 F. App'x 91 (2d Cir. 2015).[21]  Without the necessary

evidence of similarly situated comparators, Asiedu cannot meet her burden of

demonstrating facts that give rise to an inference of discrimination under a disparate

impact theory.  *Fincher*, 2008 WL 4308126, at *3 (holding that plaintiff failed to establish

*prima facie* case of racial discrimination).

Since Asiedu has failed to demonstrate disparate treatment, her claims of

discrimination regarding the failure to receive a raise can only survive if she can point to

some direct evidence that creates a genuine issue of fact as to whether her lack of raise

was motivated by racial or gender animus.  The record is devoid of any such evidence—

beyond her simply alleging so—because Asiedu has not shown that any conduct taken by

Teen was because of her race or gender.  Indeed, Asiedu testified that she did not recall

whether Teen had ever done anything to make her think he would treat her differently on

the basis of her race and gender.  Doc. 49 ¶ 99.  With respect to the immediate

circumstances surrounding the denial of a raise, there is no evidence in the record to

support an inference of racial or gender animus on the part of Teen.  Therefore, the Court

concludes that Asiedu has failed to demonstrate an adverse employment action "[w]ithout

comparing herself in this way to other[s] similarly situated."  *Inguanzo*, 2014 WL

4678254, at *14 (citing *Rooney*, 2011 WL 1303361, at *11), *aff'd*, 621 F. App'x 91.

---

[21] For the very same reasons, Asiedu's assertion that she was paid less than her white colleagues, without any supporting evidence in the record, fails.

### *Failure to Provide Various Benefits*

Asiedu asserts that Defendants discriminated against her, because Teen did not provide her with a personal office or reimburse her phone bill.  Doc. 49 ¶¶ 72, 74.

The parties dispute whether Asiedu's position warranted a private office, specifically whether she discussed confidential health information as part of her responsibilities, and whether there was available office space.  *Id.* ¶ 73.  Asiedu argues that there were two to three vacant offices, one of which was given to Aboaf, a white, part-time employee who was not an executive and worked on developing programs with Teen.  *Id.* ¶¶ 73–75.  The parties also dispute whether Asiedu's role required regular travel or the use of a personal cell phone.  *Id.* ¶ 23.  Contrary to Teen's testimony, Asiedu testified that other non-Black individuals in the same department had their bills paid by Broadreach.  Doc. 46-3 at Tr. 57:25–59:6.  However, as discussed above, it is undisputed that she was the only customer service representative.  Doc. 49 ¶¶ 18, 27.

An adverse employment action is a "materially adverse change in the terms and conditions of employment."  *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted).  Materially adverse change may be indicated by "a termination of employment; a demotion with a decrease in wage or salary or a less distinguished title; a material loss of benefits; significantly diminished material responsibilities; or other indices unique to a particular situation."  *Borrero v. Am. Exp. Bank Ltd.*, 533 F. Supp. 2d 429, 436 (S.D.N.Y. 2008).  Importantly, the change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.* (internal quotation marks and citation omitted).

Courts in this district have generally held that being denied necessary equipment and access to benefits such as a work vehicle is "simply not the type of material adverse action upon which a claim of employment discrimination may be based."  *Asanjarani v. City of New York*, No. 09 Civ. 7493 (JCF), 2011 WL 4343687, at *15 (S.D.N.Y. Aug. 18, 2011) (finding that being moved out of office and prohibited from using company car did

not constitute materially adverse employment actions) (collecting cases).  These
allegations fall into the category of "slights" that are equivalent to "[e]veryday workplace
grievances, disappointments, and setbacks" that "do not constitute adverse employment
actions."  *Williams-Lawson v. Subway Surface Supervisors Ass'n*, No. 20 Civ. 8544
(PGG) (SLC), 2021 WL 4943554, at *11 (S.D.N.Y. June 21, 2021), *report and
recommendation adopted*, No. 20 Civ. 8544 (PGG), 2021 WL 4264067 (S.D.N.Y. Sept.
20, 2021) (finding that inability to access areas of the workplace and being excluded from
meetings did not constitute materially adverse changes in employment).

Here, Asiedu asserts that she requested an office because it was "challenging" to
do her job due to "traffic, conversations, and tons of distractions."  Doc. 49 ¶ 73.  She
also testified that she wanted to be in an office for confidentiality purposes, because she
needed a quiet space.  Doc. 46-3 at Tr. 50:19–51:9.  Without more, these allegations do
not rise to the level of a materially adverse change in the terms and conditions of
employment.  Rather, these are more akin to a mere inconvenience and therefore do not
constitute adverse employment actions.

Moreover, Asiedu has failed to plead that she is similarly situated to individuals
whom she believes were treated better than she was.  At most, she points to the fact that
Aboaf, a white male part-time employee, was given an office.  Doc. 49 ¶¶ 73, 96, 99.  She
alleges that he was not an executive and was assisting the controller and developing
programs with Teen, which is a role that allegedly does not require privacy.  *Id.* ¶ 73.
Teen testified, on the other hand, that Aboaf was a department leader at Broadreach.  Doc.
46-5 at Tr. 70:19–20.  In addition, not only do these allegations establish that Aboaf was
not similarly situated to her, she testified as such.  When asked whether she performed
similar job duties and responsibilities as Aboaf, she said no.  Doc. 46-3 at Tr. 175:20–
176:13.

Next, Asiedu alleges that her role required her to travel and use her personal
phone.  Doc. 49 ¶ 23; *see also* Doc. 46-3 at Tr. 52:20–54:5, 54:15–55:21.  Nevertheless,

she does not allege how the failure to reimburse her bills resulted in a materially adverse change to her employment.  In fact, while the parties dispute the characterization of the event, it is undisputed that there was only one incident where Asiedu needed her bill to be paid in order to travel on a business trip.  Doc. 49 ¶¶ 23–24.

Moreover, Asiedu has failed to set forth any evidence, or even allege, that Defendants refused to reimburse her phone bill because of any discriminatory animus.  *See Lee v. Healthfirst, Inc.*, No. 04 Civ. 8787 (THK), 2007 WL 634445, at *16 (S.D.N.Y. Mar. 1, 2007) (finding no *prima facie* case of discrimination where plaintiff failed to offer evidence that she was denied reimbursement of work-related expenses for discriminatory reasons).  Nor does she establish how the employees who were allegedly reimbursed were similarly situated to her.  Asiedu testified that other non-Black individuals in the same department were reimbursed for their personal phone bills.  Doc. 46-3 at Tr. 57:25–59:6.  Notwithstanding the fact that this testimony is disputed, she does not dispute that she was the only customer service representative.  Doc. 49 ¶¶ 18, 27.  In fact, unlike the individuals identified by Teen as having their phone bills reimbursed because they need to be available at all times, she testified that she was only contacted on her cell phone during work hours.  Doc. 46-3 at Tr. 54:24–55:1.[22]

### Removal of Responsibilities and Exclusion from Meetings

Asiedu alleges that once she started working with Perkins, he removed certain of her responsibilities, specifically managing a computer program, and uninvited her to management meetings.  Doc. 49 ¶ 101; Doc. 46 at 7.

Courts in this district have held that "[i]t is [ ] doubtful that such exclusions from meetings and training sessions are properly considered adverse employment actions given [the] lack of any evidence that they materially affected plaintiff's working conditions and/or her prospects for promotion."  *Costanzo v. U.S. Postal Serv.*, No. 00 Civ. 5044

---

[22] For the same reasons set forth herein, Asiedu's speculation that she was not given a company credit card like her white male colleagues, without any evidentiary support, fails.

(NRB), 2003 WL 1701998, at *8 n.10 (S.D.N.Y. Mar. 31, 2003) (collecting cases). While Perkins' actions may be exclusionary and rude, none of them resulted in a materially adverse change with respect to her terms or conditions of employment. *See, e.g.*, *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 154 (S.D.N.Y. 2011) (holding that employee's supervisor taking away responsibilities and routinely excluding her from decisions, calls, and management meetings did not constitute adverse employment action); *Brailsford v. Zara USA, Inc.*, No. 14 Civ. 6999 (LGS), 2016 WL 626560, at *4 (S.D.N.Y. Feb. 16, 2016) (finding that being excluded from meetings, assigned less favorable tasks, and verbally accused of performance deficiencies did not qualify as adverse employment actions). Here, Asiedu does not adduce evidence of the effect, if any, that her exclusion from meetings or the removal of her responsibilities had on the terms and conditions of her employment. Moreover, she stated in her Complaint that Perkins permitted her to continue handling the computer program. Doc. 2 at 14. She also testified that she missed only two or three meetings before being invited back. Doc. 46-3 at Tr. 125:13–16. Thus, the Court finds that the alleged removal of responsibilities and exclusion from meetings are not adverse employment actions.

Moreover, Asiedu does not identify any employees, let alone similarly situated ones, who were not excluded from meetings or did not have responsibilities taken away. Nor does she point to any evidence in the record that Perkins' conduct was motivated by racial or gender animus.

### Termination

The parties dispute the reason for which Asiedu was terminated. While Defendants assert that Asiedu was terminated because she admitted to Savasta that she had lied about not calling Teen a "fat fuck," she argues that she was terminated due to Savasta's perception that she and Teen were no longer able to work together. The Court need not resolve this dispute, because either basis is sufficient to terminate her so long as it was not discriminatory.

31

"An employer has the prerogative to discharge an employee on the basis of subjective business judgments, for any reason that is not discriminatory; it is not the job of the Court to question the employer's means to achieve a legitimate goal." *Risco v. McHugh*, 868 F. Supp. 2d 75, 105 (S.D.N.Y. 2012) (citations omitted). Asiedu does not deny that she called Teen this derogatory term. Instead, she testified that she did not recall ever calling Teen this name.[23] As set forth above, the parties rely on conflicting evidence in the record to contest whether Ramos informed Savasta of the alleged name-calling prior to his termination of Asiedu's employment and thus whether Savasta terminated Asiedu for lying to him about using this term.

Even if Asiedu is correct—that Savasta purportedly terminated her employment because of concerns regarding her ability to work with Teen—she has not pointed to any facts that suggest this was in any way based on her protected status as a Black woman. Indeed, it is undisputed that Asiedu had spoken to several co-workers, including Teen himself, about his handling of the urination incident and the fact that she was not happy with him. Doc. 49 ¶¶ 76, 78–79, 85.

In sum, Asiedu has not submitted any evidence to show that any of the conduct she complains of was undertaken because of her race or gender. "With respect to the immediate circumstances surrounding [Asiedu's] termination, there is no evidence in the record to support an inference of racial [or gender] animus on the part of [Savasta], the ultimate decision-maker." *Risco*, 868 F. Supp. 2d at 105 (citations omitted). She merely describes her "alleged mistreatment and ask[s] the court to conclude that it must have been related to [her] race [and gender]. This is not sufficient." *Grillo v. New York City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001)) (internal quotation marks omitted).

---

[23] In an attempt to explain her testimony, Asiedu states that her conversation with Ramos happened over a year ago and that she was very upset and wanted to report Teen to Savasta. Doc. 49 ¶ 79

Moreover, Asiedu has not identified any individuals who engaged in similar conduct and were similarly situated to her and not terminated.  In fact, it is undisputed that Howard was terminated for lying to Savasta.  Doc. 49 ¶ 92; *see also* Doc. 46-4 at Tr. 211:10–214:9.  Furthermore, she testified that it would be a violation of Broadreach's policies for an employee to lie at work or call a supervisor inappropriate names.  Doc. 46-3 at Tr. 32:9–33:4.  Accordingly, Asiedu has failed to establish a *prima facie* case of discrimination on the basis of race or gender.

### ii.     Legitimate, Non-discriminatory Reason for Decision

Assuming *arguendo* that Asiedu has stated a *prima facie* case of discrimination on the basis of race and gender—which she has not—the burden shifts to Defendants to demonstrate a legitimate, non-discriminatory reason for their decision to terminate her.[24]

The Court finds that summary judgment is still appropriate, because the rationale proffered by Defendants satisfies their burden of production in articulating a legitimate, non-discriminatory reason for terminating Asiedu's employment.  Defendants assert that Asiedu was terminated as a result of her lying to Savasta about having called Teen a name.  Courts in this district have held that an employee's disruptive behavior or negative attitude is a legitimate, non-discriminatory reason for termination.  *See, e.g.*, *Sklar v. N.Y. Life Ins. Co.*, 34 F. App'x 403, 405 (2d Cir. 2002) (summary order) (holding that plaintiff's disrespect for supervisors was a legitimate, non-discriminatory reason for termination); *Varughese v. Mount Sinai Med. Ctr.*, No. 12 Civ. 8812 (CM) (JCF), 2015 WL 1499618, at *53–56 (S.D.N.Y. Mar. 27, 2015) (finding that unprofessional behavior, including using inappropriate language, would provide a legitimate, non-discriminatory reason for termination), *aff'd*, 693 F. App'x 41 (2d Cir. 2017); *Burgos v. Sullivan &*

---

[24] The Court does not analyze Defendants' reasons for their (1) alleged failure to properly investigate certain incidents, (2) alleged failure to give Asiedu a promotion-based raise, (3) alleged failure to provide her with a personal office and reimburse her phone bill, and (4) alleged removal of Asiedu from meetings and certain responsibilities, because, as set forth herein, these allegations do not rise to the level of an adverse employment action.  Therefore, for the purposes of this analysis, the Court looks only at Defendants' decision to terminate her employment.

*Cromwell*, No. 99 Civ. 11437 (AS), 2001 WL 709268, at *11 (S.D.N.Y. June 25, 2001) (finding that plaintiff's insubordinate and uncooperative behavior could be a legitimate reason for termination).

Courts have also found that lying to a supervisor is a legitimate basis for termination. *See, e.g.*, *Sandman v. Mediamark Rsch., Inc.*, No. 00 Civ. 6529 (JSM), 2002 WL 424660, at *7 (S.D.N.Y. Mar. 18, 2002) ("Dishonesty is a legitimate, nondiscriminatory reason for terminating an employee, especially when it is stated in the company's policy" (citing *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 169 (2d Cir. 2001)); *see also Calle v. ISS Cleaning Servs.*, No. 00 Civ. 3706 (WK), 2001 WL 1580242, at *2 (S.D.N.Y. Dec. 11, 2001). Accordingly, Defendants have demonstrated a legitimate, non-discriminatory reason for the termination of Asiedu's employment.

### iii.    Pretext

Because Defendants have articulated a legitimate, non-discriminatory reason for their decision, the burden shifts back to Asiedu to demonstrate that Defendants' proffered non-discriminatory reason was pretextual—that is, that gender and race discrimination were the real reasons for the decision to terminate her employment.

In an attempt to satisfy her burden at the third stage of the *McDonnell Douglas* test, Asiedu disputes that Savasta terminated her because she allegedly lied about calling Teen names. Notably, she does not dispute calling Teen this derogatory term. She does, however, contend that she and Savasta did not discuss this topic during their meeting, which resulted in her termination. Instead, in direct contradiction to Savasta's testimony, which sets forth how Asiedu first denied then admitted to calling Teen the disparaging term, she testified that their meeting, and her resulting termination, was purportedly based on her issues with Teen and their working relationship. The evidence in the record concerning this conflict is not definitive and is at times contradictory. For example, Ramos testified that she only told Savasta that Asiedu had called Teen this name after Asiedu had already been terminated. Doc. 46-6 at Tr. 227:10–23, 228:4–7, 229:2–10.

However, declarations from Ramos and Savasta dated October 9, 2020 state that Ramos immediately notified Savasta of this alleged name-calling. Doc. 36-19 ¶ 4; Doc. 36-20 ¶ 3. Furthermore, Savasta testified that three employees, including Fendrich, informed him of this name-calling before his meeting with Asiedu. Doc. 36-3 at Tr. 329:23–331:14. However, in an email from Fendrich to Savasta dated February 15, 2018, Fendrich describes his February 8, 2018 conversation with Asiedu, but fails to mention any name-calling. Doc. 36-17.

Based on this evidence, Asiedu asserts that the actual proffered reason for her termination was concern with her ability to continue working with Teen.

Thus, there may be a question of fact as to Defendants' reason for terminating Asiedu. However, even to the extent Asiedu raises questions of fact regarding pretext, the record is insufficient to raise questions of *material* fact regarding unlawful discrimination. "[A] showing of pretext is not necessarily sufficient to establish unlawful discrimination." *Burgos*, 2001 WL 709268, at *11 (collecting cases). The Court must make a case-specific determination regarding evidence of discrimination. *Id.* Asiedu offers no evidence that anyone involved in the decision to terminate her employment had ever exhibited any sort of discriminatory animus. *See Varughese*, 2015 WL 1499618, at *54, *aff'd*, 693 F. App'x 41. Nor has she identified anyone else who committed similar misconduct, whether it was lying about calling a supervisor a disparaging name or not being able to work with a supervisor. *Id.* In fact, as discussed above, it is undisputed that Savasta terminated another employee for lying. Doc. 49 ¶ 92.

Assuming *arguendo* that Asiedu is correct—that Defendants' proffered reason for her termination was her disagreement with Teen's handling of the urination incident—if Defendants believed that she would not be able to productively work with Teen going forward, this is a legitimate, non-discriminatory reason for her termination. *See, e.g.*, *Risco*, 868 F. Supp. 2d at 94, 106 (finding that plaintiff's inability to "get along" with co-workers and "disruptive conduct" were legitimate reasons for termination); *Rikhy v. AMC*

*Computer Corp.*, No. 01 Civ. 7007 (WHP), 2003 WL 1618529, at *4 (S.D.N.Y. Mar. 28, 2003) (holding that inability to get along with supervisors and co-workers constitutes legitimate, non-discriminatory reason for discharge), *aff'd*, 95 F. App'x 388 (2d Cir. 2004); *Thermidor v. Beth Israel Med. Ctr.*, 683 F. Supp. 403, 412 (S.D.N.Y. 1988) ("It is widely acknowledged that . . . conflicts with persons in positions of authority constitute legitimate nondiscriminatory reasons justifying discharge.").  By her own admission, Asiedu spoke with multiple employees at Broadreach, including Teen, regarding her unhappiness with how he handled the urination incident.  Doc. 49 ¶¶ 76, 78–79, 85. Asiedu may take issue with Savasta's belief that she would not be able to work with Teen going forward, but "an employer is permitted to set its own performance standards . . . so long as they are not discriminatory."  *Varughese*, 2015 WL 1499618, at *55, *aff'd*, 693 F. App'x 41 (internal quotation marks and citation omitted); *see also Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008) ("[I]t is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination."), *aff'd*, 360 F. App'x 214 (2d Cir. 2010).

"In sum, considering the evidence as a whole, a factfinder could not conclude that [Asiedu] has satisfied her burden of proving unlawful discrimination, even if the factfinder concluded that [Defendants'] proffered reasons for [their] actions were not the real reasons."  *Burgos*, 2001 WL 709268, at *11 (citing *James v. New York Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000) (affirming summary judgment for defendant even where plaintiff offered evidence of pretext because evidence was insufficient to support finding that discrimination was the reason for termination)).  Accordingly, the Court grants summary judgment dismissing Asiedu's Title VII, Section 1981, and NYSHRL discrimination claims.

### B.  Retaliation Claims

Title VII, Section 1981, and the NYSHRL all prohibit retaliation for engaging in a "protected activity."  For example, Title VII prohibits employers from discriminating against an employee because "he [or she] has opposed any practice made an unlawful employment practice by this subchapter" or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a).

Retaliation claims are evaluated under the *McDonnell Douglas* three-step burden-shifting test.  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).  To establish a *prima facie* case of retaliation, an employee must show that:  (1) she was engaged in a protected activity; (2) the defendant was aware of the protected activity; (3) she suffered a materially adverse action; and (4) there is a causal connection between her protected activity and the materially adverse action.  *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012); *see also Kelly v. Howard I. Shapiro & Assoc. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) ("The standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL."); *Little v. Northeast Utilities Service Co.*, 299 F. App'x 50, 52 (2d Cir. 2008) (applying the same standard to retaliation claims brought under Title VII and Section 1981).

While a protected activity generally involves the filing of a formal complaint of discrimination with an administrative agency, *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 65 (2d Cir. 1992), the Second Circuit has recognized that "protected activity" includes "informal protests of discriminatory employment practices, including making complaints to management."  *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).  However, such informal complaints must be sufficiently specific to make it clear that the employee is complaining about prohibited conduct.  *Risco*, 868 F. Supp. 2d at 110.

The term "protected activity" refers to "action taken to protest or oppose statutorily prohibited discrimination." *Wimes v. Health*, 157 F. App'x 327, 328 (2d Cir. 2005) (citation omitted). The plaintiff must "demonstrate that she has asserted a claim of discrimination based on her status as a member of a protected category." *Whitley v. Montefiore Med. Grp.*, No. 13 Civ. 4126 (LTS), 2016 WL 1267788, at *11 (S.D.N.Y. Mar. 30, 2016). "A generalized complaint about perceived mistreatment without a specific connection to discrimination based on membership in a protected class is insufficient to establish a protected activity." *Id.*

Asiedu's assertion that she engaged in protected activity prior to her termination is not supported by any evidence.[25] In fact, her assertion is contradicted by her testimony that she did not recall reporting any complaints to anyone at Broadreach or TriNet about racial or gender discrimination. Doc. 36-2 at Tr. 30:16–31:6. Nor did she recall that Teen had ever done anything to make her think that he would treat her differently because she is a Black woman. *Id.* at Tr. 160:24–161:11. Although Asiedu now disputes her own testimony, to the extent she alleges that she did complain to her supervisors about discrimination, this argument fails.

With regard to gender discrimination, Asiedu argues that while "it [was] clear that [she] was discriminated against as a woman" because she did not receive her own office or a salary increase in conjunction with her promotion, she "did not report this issue to anyone out of fear of going against Teen and [she] was not comfortable voicing a complaint against him on the matter." Doc. 49 ¶ 96. Thus, Asiedu herself establishes that she never reported any complaints about being discriminated against on the basis of gender.

---

[25] In opposition, Asiedu states solely that her alleged protected activity was her report about how Teen addressed the urination incident and the alleged adverse action was her termination. *See* Doc. 46 at 14–15. However, the Court also considers the allegations concerning retaliation in her response to Defendants' Local Rule 56.1 Statement.

With respect to racial discrimination, Asiedu refers to her reports concerning the pornography incident, the call center representatives who spoke only Spanish, the anonymous email, the urination incident, and how Teen handled the urination incident. *Id.* ¶ 97. However, these complaints cannot satisfy the "protected activity" requirement of her *prima facie* case. In connection with Asiedu's report that John Savasta was watching pornography, nowhere is it alleged that she reported that this was in any way connected to her race or that the way it was handled by Broadreach evinced discrimination. *Id.*; *see also* Doc. 36-15 at 3, 11, 12. In connection with her co-workers speaking only Spanish, while Asiedu reported "a hostile call center environment" in which she was "isolated," it is not clear that her report alleged that she was being discriminated against on the basis of her race. Doc. 49 ¶ 97; *see also* Doc. 36-15 at 4, 11–12 ("Many times, I would complain [that my colleagues' speaking to each other in Spanish] made me uncomfortable. . . . I express[ed] discomfort in working in that environment. . . . I felt very isolated."). Moreover, "[t]he Court finds that such a complaint does not constitute protected activity because a racial comment or discriminatory act by a co-worker or subordinate, 'absent any allegation that [he or she] was involved in any decision affecting plaintiff's employment, is insufficient to establish a § 1981 claim' for retaliatory termination." *Williams-Lawson*, 2021 WL 4943554, at \*12 (citation omitted), *report and recommendation adopted,* 2021 WL 4264067. In connection with the anonymous email, while the email is undoubtedly racially harassing and Asiedu reported that the email contained "racial insults," Doc. 36-15 at 11, it was sent anonymously. Even taking into consideration Asiedu's "suspicion" and "gut feeling" that an employee for JNS sent the email, *id.* at 3, 8, 11, she makes no allegation that this individual was at all involved in any decision concerning her employment. In connection with the urination incident, and how Teen addressed it, Asiedu does not point to any evidence in the record that her reports asserted racial discrimination.

Even if Asiedu could make out a *prima facie* case of retaliation, which she cannot,[26] her claim must be dismissed, because, as set forth above, she has not shown that Defendants' reason for her termination was pretextual.  See *Auguste v. New York Presbyterian Med. Ctr.*, 593 F. Supp. 2d 659, 666 (S.D.N.Y. 2009).  There is no evidence in the record, absent Asiedu's unsupported assertions, that retaliation motivated, in part or in full, her termination.  Indeed, an employee's failure to get along with her supervisor and dishonesty have often been recognized as legitimate, non-discriminatory reasons for termination.  *See id.*; *Sandman*, 2002 WL 424660, at *7 (citing *Roge*, 257 F.3d at 169).

Accordingly, Defendants are entitled to summary judgment dismissing Asiedu's retaliation claims.

## IV.   CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment is GRANTED.  Accordingly, Defendants' request for oral argument is DENIED as moot.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 34, and close the case.

It is SO ORDERED.

Dated:   September 13, 2022
         New York, New York

_____
                    Edgardo Ramos, U.S.D.J.

---

[26] For example, under the third prong to establish a *prima facie* case, Asiedu testified that she was not subject to mistreatment as a result of her various complaints.  Doc. 49 ¶¶ 38, 52, 67, 68.  As required by the fourth prong, it is doubtful that Asiedu may plausibly plead a connection between any adverse employment action alleged and her engagement in alleged protected activity.  She has not offered any evidence of retaliatory animus, nor has she demonstrated that any alleged protected activity was followed "closely in time" by any alleged adverse employment action.  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015); *see also Whitley v. Montefiore Med. Grp.*, No. 13 Civ. 4126 (LTS), 2016 WL 1267788, at *11 (S.D.N.Y. Mar. 30, 2016).